657 So.2d 142 (1995)
Thalia Ann TOUPS, Plaintiff-Appellant,
v.
EQUITABLE LIFE ASSURANCE, et al., Defendants-Appellees.
No. 94-1232.
Court of Appeal of Louisiana, Third Circuit.
May 3, 1995.
Order Granting Limited Rehearing and Amending Opinion July 19, 1995.
*143 Ronald J. Fiorenza, Alexandria, Ralph W. Kennedy, Alexandria, for Thalia Ann Toups.
Grove Stafford, Jr., Andrew Parker Texada, Alexandria, for Equitable Life Ins.
John Gutierrez McLure, Alexandria, for William Stephens.
Before PETERS, AMY, and SULLIVAN, JJ.
PETERS, Judge.
The plaintiff, Thalia Ann Toups, brought this action to recover benefits under two policies of disability income insurance issued by the defendant, The Equitable Life Assurance Society of the United States (Equitable). She also named as defendant, William E. Stephens, Sr., the Equitable agent who sold the policies to her. Equitable filed a reconventional demand seeking the return of $11,600.00 in benefits already paid and filed a third party claim against Stephens. After trial, the trial court rendered judgment dismissing plaintiff's demands against the defendants as well as the reconventional demand and third party claim of Equitable. Only the plaintiff has appealed.

DISCUSSION OF RECORD
The plaintiff is a clinical social worker who began an outpatient psychotherapy practice in Alexandria, Louisiana, in 1985. In 1987, she and Patricia Godfrey, another clinical social worker and close friend of twenty years, formed North River Company, Incorporated, a corporation through which they offered their professional services to the public. By mid-1989, the business had become very successful, in large part as a result of the work ethic of Ms. Toups, whom Ms. Godfrey described at that time as an "incredibly energetic, active person." As a result of the corporation's success, Ms. Godfrey concluded there was a need for financial protection for Ms. Toups because the corporation was heavily dependent on her ability to work. In seeking information concerning possible insurance coverage, Ms. Godfrey turned to William E. Stephens, Sr., a cousin of the plaintiff, who had just recently joined Equitable.
Stephens had only joined Equitable on July 17, 1989, and became licensed as an agent of the company on August 1, 1989. In early August of 1989, Stephens and another Equitable agent, Tom Petrus, met with Ms. Toups and made a sales presentation of a disability income policy. The presentation was actually made by Petrus, who was an experienced Equitable agent and was responsible for training Stephens. Although Stephens had completed an Equitable training program, his participation in this presentation was his first experience with Equitable's disability income policy.
The policy application was not completed the day of the presentation. A few days later, Stephens met with Ms. Toups alone and completed the application. Petrus had been scheduled to conduct the application interview but cancelled at the last moment, leaving Stephens with no instruction as to how to proceed. In fact, Stephens' first experience in interviewing a client and completing any type of application on behalf of Equitable was on this occasion. Stephens orally propounded the application questions to Ms. Toups and recorded his interpretation of her answers. According to Ms. Toups, she did not sign the application that day. She testified *144 that Stephens took it back to his office to inquire as to some questionable matters and later presented the application, which she signed.
After acceptance of the application, Equitable issued a policy which provided for monthly disability income benefits in the amount of $3,800.00. The policy had an effective date of August 9, 1989, and, among other terms, contained a guaranteed insurability rider giving the plaintiff the option to purchase up to $2,000.00 per month in additional income disability benefits regardless of her medical condition at the time of purchase. Approximately one year later, Ms. Toups exercised her guaranteed insurability rider and purchased a second policy thereby increasing her coverage by $2,000.00 per month effective August 9, 1990.
On September 11, 1991, Ms. Toups was diagnosed as suffering from chronic fatigue syndrome, a debilitating condition. Her claim for benefits under the policies was initially honored, and Equitable paid $11,600.00 for the months of September and October of 1991. Thereafter, the benefits were suspended, and after Equitable obtained copies of the plaintiff's medical records, it denied coverage on the basis of material misrepresentation.
Equitable rejected the claim based on the answers to the application as recorded by Stephens. The answers in question are found in Sections 1, 3, and 5 of the application. In Section 1, the plaintiff gave the name and address of Dr. Richard G. Gaynor of Baton Rouge, Louisiana, as her personal physician. She was also asked the following questions in Section 1:
d. Date and reason last consulted [her personal physician] if within the last 5 years.
To this question Stephens recorded "PMS No treatment given."
In Section 3 of the application, Stephens recorded a negative response on behalf of plaintiff to the following questions:
Have you ever been treated for or had any known indication of:
. . . .
b. Emotional, psychological, mental or nervous system disease or disorder, convulsions or epilepsy?
. . . .
f. Any disease or disorder of the blood or lymphatic systems?
A negative response was also recorded by Stephens on behalf of the plaintiff to the following questions in Section 5:
Other than above, have you within the past 5 years:
a. Consulted or been examined or treated by any physician or practitioner, or visited a psychiatrist, psychologist, psychiatric social worker, psychotherapist or counselor for any reason?
b. Been a patient in a hospital, clinic, sanatorium, or other medical facility? Had any diagnostic test?
c. Been advised to have any diagnostic test, hospitalization, treatment or surgery which was not completed?
d. Had any illness, injury, or surgery? Have you any deformity, lameness or amputation?
A review of Ms. Toups' medical history reveals there are inaccuracies on the application. In 1985, she had undergone radial keratotomy; in 1986, she was diagnosed as having a cystic fibroma lump in the right breast; and in 1987, she was involved in an automobile accident for which she received medical treatment. These constitute consultation, diagnostic testing, injury, and treatment within five years prior to the insurance application.
Dr. Gaynor became the plaintiff's personal physician beginning January 15, 1987, and was still seeing her professionally as of the effective date of the policy. During that period, the plaintiff related numerous complaints to Dr. Gaynor, almost all of which he ultimately attributed to her premenstrual syndrome condition. Included in those complaints were insomnia, anxiety, irritability, depression, headaches, fever, diarrhea, menstrual spotting, irregular flow, excessive flow, weakness, and tiredness.
In February of 1988, because of Ms. Toups' complaints, Dr. Gaynor suspected a possible Epstein Barr virus and ordered laboratory *145 tests which produced normal results. Dr. Gaynor's medical care consisted of the treatment of the plaintiff's symptoms with various medications. Despite her numerous complaints, he considered her to be in general good health, and at no time during his treatment of Ms. Toups did the doctor consider her premenstrual syndrome to be severe or disabling. Prior to the issuance of the policy, other than premenstrual syndrome complaints, Dr. Gaynor only treated the plaintiff for back pain, a skin rash, and an ear infection.
On May 16, 1989, an incident occurred which is the pivotal event giving rise to this litigation. On that day the plaintiff left work early. Ms. Godfrey, who was also the plaintiff's roommate, arrived home later and found the plaintiff in a catatonic state, unable to speak or respond. She attempted to revive the plaintiff and called an ambulance. When the paramedics arrived, they administered glucose to the plaintiff, and she was revived. The ambulance then carried her to Rapides General Hospital in Alexandria, Louisiana, where a Dr. Reed was on duty in the emergency room. Apparently Ms. Toups and Dr. Reed were involved in an earlier professional dispute and Ms. Toups did not entirely trust his professional judgment. She underwent numerous tests at the emergency room including blood work, an EKG, and a chest X-ray. Dr. Reed recommended she stay overnight, but she refused.
She did seek follow-up treatment with Dr. Gaynor who diagnosed her condition as reactive hypoglycemia, or low blood sugar. Later test results discounted other possible causes of the incident, and Dr. Gaynor related the hypoglycemia to the underlying premenstrual syndrome condition.
After the policy was written, Ms. Toups continued to be treated for premenstrual syndrome and ultimately had a hysterectomy, which gave her some relief. However, in 1991, she began to suffer additional symptoms and was ultimately seen by Dr. Patricia Denise Salvato of Houston, Texas, who diagnosed her condition as chronic fatigue syndrome. Dr. Salvato first examined the plaintiff on August 21, 1991. At that time, the plaintiff was suffering from a mild fever and chills, sore throat, sore lymph nodes, muscle weakness and aches, fatigue, general headaches, joint pain, difficulty concentrating, and sleep disorder. It was Dr. Salvato's opinion that the chronic fatigue syndrome had manifested itself since October of 1990. Also, she testified that her condition prior to August of 1989, was not consistent with chronic fatigue syndrome, an opinion shared by Dr. Gaynor. In fact, when Dr. Gaynor saw the plaintiff again on February 7, 1992, he was "shocked" at the change in her condition.
After obtaining the plaintiff's medical history and discovering the inaccuracies in the application, Equitable rejected coverage. As a result, this litigation arose.

OPINION
La.R.S. 22:619(B) provides:
B. In any application for life or health and accident insurance made in writing by the insured, all statements therein made by the insured shall, in the absence of fraud, be deemed representations and not warranties. The falsity of any such statement shall not bar the right to recovery under the contract unless such false statement was made with actual intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer.

(Emphasis added).
Although the statute requires that when an application contains false statements the insurer must prove either intent to deceive or that the falsity materially affected the risk accepted by the insurer, Louisiana courts have interpreted this statute to require proof of both elements. Coleman v. Occidental Life Ins. Co. of N.C., 418 So.2d 645 (La.1982); Jamshidi v. Shelter Mut. Ins. Co., 471 So.2d 1141 (La.App. 3 Cir.1985); Antill v. Time Ins. Co., 460 So.2d 677 (La.App. 1 Cir.1984). Thus it is clear that the insurer must prove three elements to avoid payment: (1) Knowing falsity, (2) intent to deceive, and (3) material effect of risk. Still, the insurer may carry its burden through the presentation of circumstantial evidence.
The difficulty of proving intent to deceive is recognized by the courts, [sic] thus *146 the courts look to the surrounding circumstances indicating the insured's knowledge of the falsity of the representation made in the application and his recognition of the materiality of his misrepresentations, or from circumstances which create a reasonable assumption that the insured recognized the materiality.

Jamshidi, 471 So.2d at 1143.
The responses recorded by Stephens can be construed as misrepresentations although the evidence is in conflict as to who actually was responsible for recording the inaccurate answers. These answers constituted the basis of the trial court's ruling which was expressed as follows:
These answers are not correct. They're just not correct at all. Now, as to the incident with Dr. Reed, there is evidence that she did tell Mr. Stephens about Dr. Reed and he didn't know what to do with it. And that may be true, and I think it is true that she did tell him about Dr. Reed. But I can't get over the fact, I can't get beyond the fact, that we are here dealing with a lady who ... is a college graduate, has a masters degree in social work, who is filling out an application to receive the benefits of an insurance policy which will guarantee her $5,800.00 a month in the event of her inability to work at her $80,000.00 a year job. I think that in this case there are just too many ... no answers that are just not true.... I think in this case that irregardless of the situation with Mr. Stephens, that this ... there are just too many no answers that are not correct in this case. And I think the company was ... within its rights, once it found out the truth based upon the medical history that's been presented, to deny coverage.
(Emphasis added).
Thus, the trial court based its opinion solely on the alleged misrepresentations and did not address the issues of intent to deceive or material effect of the risk. We must therefore address these de novo.
We find no evidence that the plaintiff intended to deceive the insurer. In fact, the evidence is to the contrary. Ms. Toups testified that she told Stephens of her mammogram and that the tests were normal; that she had been involved in two automobile accidents; that she was taking medications which she identified; about the Rapides General Hospital incident with Dr. Reed; and about her diagnosis of reactive hypoglycemia. The application itself reflects that she informed Stephens of the premenstrual syndrome condition, and Ms. Toups testified that she did not consider her condition to be serious. Her explanation of the phrase "No treatment given" was that there is no treatment for premenstrual syndromethat the doctor could only treat the symptoms.
Stephens testified he was aware of the incident at the Rapides General Hospital and that he was supplied with other information by Ms. Toups which he did not record because he did not know what to do with it. He further testified that he felt awkward during the application because he had never asked the questions before and that he did not even ask the plaintiff if she was taking medication. Although he did not recall discussions of hypoglycemia, he did state that he might not have even known what it was at the time of the application. He further testified that Ms. Toups told him she had been seeing Dr. Gaynor for premenstrual syndrome and that Dr. Gaynor had all of her records. He also understood that there was no treatment for premenstrual syndrome.
At the time of the application, Stephens indicated he would not have put down routine exams and that they were normal as he did not want to "dilly the application up with a bunch of details." Additionally, had he been informed that tests were made and results were found to be normal, he would not have put them down. He acknowledged that he did not honestly know what he was doing during this application process.
Had the plaintiff attempted to intentionally mislead Equitable, it is reasonable to conclude she would not have supplied the information she did. One attempting to intentionally mislead an insurer would not supply the insurer with partial information, which, if checked, might cause the application to be rejected. There is no evidence that she had any reason to believe any of the answers *147 placed on the application by Stephens were misleading in accordance with Equitable's guidelines. If an agent by mistake, fraud or negligence inserts erroneous or untrue answers to the questions contained in the application, those representations are not binding upon the insured. Bertrand v. Protective Life Ins. Co., 419 So.2d 1254 (La.App. 3 Cir.1982). Additionally, an insurance applicant may rely upon and sign an application as completed by the agent and may rely upon the agent's expertise in interpreting the nature of the information sought by the company he represents. Economy Auto Salvage, Inc., v. Allstate Ins. Co., 499 So.2d 963 (La. App. 3 Cir.), writ denied, 501 So.2d 199 (La.1986). We do not conclude that inaccuracies in transcribing information furnished to an agent by an insured can be used by the insurer to defeat the insured's claim.
Thus, having found the plaintiff had no intent to deceive Equitable in the issuance of the policy, it follows that Equitable has not met its burden of proof under La.R.S. 22:619(B) as interpreted by the jurisprudence cited herein. We therefore reverse the trial court's judgment denying the plaintiff's claim for benefits.
The plaintiff also seeks penalties and attorney fees under La.R.S. 22:657(A) which requires an insurer to pay a claim within thirty days "unless just and reasonable grounds, such as would put a reasonable and prudent businessman on his guard, exist." This provision is penal in nature and must be strictly construed such that penalties and attorney fees may not be imposed unless the refusal to pay is found to be arbitrary and capricious. Rippon v. Variable Protection Admins., Inc., 537 So.2d 262 (La.App. 4 Cir. 1988), writ denied, 541 So.2d 833 (La.1989); Posey v. Board of Trustees, State Employees Group Benefits Program, 426 So.2d 705 (La. App. 1 Cir.1982), writ denied, 429 So.2d 139 (La.1983). We do not find that Equitable's actions in this case were arbitrary and capricious.
Equitable contends that in the event it is cast in judgment in this case, it is entitled to judgment against Stephens for any amount for which it is liable. We disagree. It is undisputed that Stephens was the agent of Equitable. We are unsure whether Equitable is arguing that Stephens exceeded his authority or was merely negligent in carrying out his authority. In any event, we conclude that any negligence on the part of Stephens is attributable to Equitable for failing to properly train or supervise Stephens or both.

DISPOSITION
For the foregoing reasons, the judgment of the trial court is reversed. Judgment is rendered granting the demands of the plaintiff for benefits under the policy but rejecting the claim for penalties and attorney fees. Judgment is also rendered rejecting Equitable's third party demand against William E. Stephens, Sr. All costs are taxed against the defendant, The Equitable Life Assurance Society of the United States.
REVERSED AND RENDERED.

ON REHEARING
PER CURIAM.
The Equitable Life Assurance Society of the United States has applied for a rehearing of that portion of the judgment of this court denying its third party demand against its agent, William E. Stephens, Sr. Equitable contends that Stephens was at fault in failing to write down everything plaintiff told him about her medical history during the application process. We originally concluded that any negligence on the part of Stephens in completing the application was attributable to Equitable for failing to properly train or supervise him. After further review, we conclude Equitable is correct that Stephens was at fault, and therefore, Equitable is entitled to recovery.
In this case we do not find controlling the issue of whether Stephens received adequate training concerning information to be included on an insurance application. Stephens was licensed by the State of Louisiana as a qualified agent. The training required by Equitable was supplemental to the state requirements and was designed primarily to familiarize Stephens with the Equitable procedures. In fact, no special training was *148 necessary to fill out the insurance application. It simply required that the questions be answered in full.
An attorney-in-fact, or agent, "is responsible, not only for unfaithfulness in his management, but also for his fault or neglect." La.Civ.Code art. 3003. Additionally,
It is settled law that where an insurer is exposed to liability for policy claims because of action by its agent beyond the agent's authority or contrary to instructions, the agent is accountable to the insurer for the latter's loss.
Richard v. Am. Fed'n of Unions Local 102, 378 So.2d 564, 568 (La.App. 3 Cir.1979). (Emphasis added).
Stephens needed no training to any greater degree than what he had already received to follow instructions. Concerning his failure to follow the instructions of his supervising agent, Petrus, Stephens testified as follows:
Q. Okay. So [Petrus'] instructions to you although maybe not as articulate as he would have liked, were ask these questions and write down her responses?
A. Yes.
Q. Okay. Is that what you did?
A. No.
Citing Lesesne v. Cook, 16 La. 58 (1840), Stephens argues that he acted in good faith and his failure to properly complete the application constituted an error in judgment for which he is not responsible. We do not consider that failure to follow instructions constitutes an error in judgment. It is simply a failure "to discharge the functions of the procuration" for which Stephens "is responsible to his principal for the damages" incurred as a result of the action. La.Civ. Code art. 3002. That is to say, Equitable's loss resulted from Stephen's "fault." La.Civ. Code art. 3003.
For these reasons, we have granted the rehearing for the limited purpose of considering the liability of William E. Stephens, Sr., the third party defendant, as to The Equitable Life Assurance Society of the United States, the third party plaintiff, and amending the original opinion accordingly. We now grant the third party claim by The Equitable Life Assurance Society of the United States for indemnity against William E. Stephens, Sr., for any and all sums which may be owed by Equitable to the original plaintiff, Thalia Ann Toups.